IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

EDDIE VINCENT RUTLEDGE,

      Plaintiff,

v.                                              CASE NO. 5:15-cv-42-RV-GRJ

LINDA CAIN, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff, an inmate in the custody of the Florida Department of

Corrections ("FDOC"), is proceeding *pro se* pursuant to 42 U.S.C. § 1983.

ECF No. 8 (First Amended Complaint).  The Complaint stems from an

injury that Plaintiff sustained while he was confined at Jackson CI.

According to the factual allegations of the First Amended Complaint, on

April 11, 2013, Plaintiff sustained a ruptured right Achilles tendon on the

recreation yard.  Plaintiff alleges that prison medical staff denied him

"immediate and urgent emergency care" by preventing his immediate

admission to a hospital.  He alleges that staff ordered x-rays but no MRI

which would have identified the injury.  He alleges that he was not provided

with walking aids or sufficient pain medication, and that he walked

unassisted on the injury for three months before receiving a proper

diagnosis following an MRI.  Plaintiff alleges that he re-tore the tendon on

August 14, 2013, during obligatory recreation, but officials refused to order a second MRI and refused to provide him with a wheelchair for safe mobility.   He received a soft cast pending surgery.  After surgery, he was not prescribed sufficient rehabilitation or footwear.  He also alleges that he contracted a MRSA infection after surgery.  Plaintiff alleges that prison medical staff were deliberately indifferent to his serious medical needs in violation of his eighth amendment rights and that their actions amount to malpractice.   ECF No. 8.

This case is now before the Court on the motion for summary judgment of Defendants Corizon, LLC, Linda Cain, Gilda Epps, and Sandra Streetman ("Corizon Defendants") (ECF Nos. 58, 59), and the motion for summary judgment of Defendant Dr. Juan Almeyda-Gomez (ECF No. 80). Plaintiff has filed responses in opposition (ECF Nos. 69, 85) and Defendants have filed replies (ECF Nos. 70, 87).  For the reasons discussed below, it is recommended that the motions for summary judgment be granted.[1]

## I.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that

---

[1] Dr. Almeyda-Gomez previously filed a motion to dismiss the complaint for failure to state a claim upon which relief may be granted.  ECF No. 63.  In light of the recommendation that summary judgment be granted, that motion is due to be denied as moot.

"there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F. 2d 1328, 1330 (11th Cir. 1988).

As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785-86 (11th Cir. 2005).

Because Plaintiff is proceeding *pro se*, his pleadings are held to a less stringent standard and will be liberally construed.  *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003).  Further, for purposes of summary

judgment, the Court may also consider as summary judgment evidence the factual allegations – but not the legal conclusions – contained in his verified pleadings.  *See United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1444 n.35 (11th Cir. 1991); *Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir. 1980); *Fowler v. S. Bell Tel. & Tel. Co.*, 343 F.2d 150, 154 (5th Cir. 1965). Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *See, e.g., Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## II.  DELIBERATE INDIFFERENCE

The Constitution forbids prison officials from consciously ignoring the serious medical needs of prison inmates.  Such "deliberate indifference" to an inmate's serious medical need by a state actor is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *See Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976).  To show that the prison official was deliberately indifferent, the plaintiff must prove that: (1) the prison official had a subjective knowledge of a risk of serious harm; (2) the prison official disregarded that risk; and (3) did so by conduct that is more than mere negligence.  *Brown v. Johnson*, 387 F.3d 1344,1351 (11th Cir. 2004); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (the prisoner

must demonstrate that the officials' response was so inadequate as to "constitute an unnecessary and wanton infliction of pain," and was not "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."

Generally, an inmate who receives a medical diagnosis and care, but desires a different diagnosis or treatment, can't show deliberate indifference. *Hamm v. DeKalb County*, 774 f.2d 1567, 1575 (11th Cir. 1985); *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle*, 429 U.S. at 107) ("[A]s *Estelle* teaches, the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment is a 'classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment.");  *v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("'[W]e disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. Along with all other aspects of health care, this remains a question of sound professional judgment.'"); *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988) ("Although the Constitution does require that prisoners be provided with a certain

minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice.").

Where the case turns on an alleged delay in providing medical care, rather than the type of medical care provided, courts should consider: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay. *Goebert v. Lee Cnty.,* 510 F.3d 1312, 1327 (11th Cir. 2007) (*citing Hill*, 40 F.3d at 1189).

## III.  DISCUSSION

Defendants' summary judgment evidence may be summarized as follows.  On April 11, 2013, Nurse Epps saw Plaintiff for complaints that he had injured his right foot and ankle while another inmate fell on him playing basketball.  (ECF No. 58, Exhibit B, Declaration of Guilda Epps ¶ 5). Nurse Epps observed that Plaintiff's ankle had appropriate coloring and moderate swelling.  (*Id.*)  She gave Plaintiff Ibuprofen for pain, an ice pack and an ACE bandage.  (*Id.*)  Nurse Epps instructed Plaintiff on the proper way to apply the ACE wrap; to keep his right foot elevated for two to three days; to apply the ice pack three to four times a day, for two to three days; to take his Ibuprofen with food; to report any skin discoloration immediately; and to make a sick-call request if his pain worsened or he felt he needed to see a physician.  (*Id.*)  She observed that Plaintiff was able to

stand, walk, and put pressure on his right foot.  (*Id.*)  She noted nothing that suggested Plaintiff's condition constituted an emergency.  (*Id.*)

On April 14, 2013, Plaintiff was seen for a follow-up and complained his ankle injury was worsening.  (Exhibit A, Declaration of Sandra Streetman, A.R.N.P.  ¶ 7).  Plaintiff was observed with no numbness or tingling, but with swelling and unable to move his foot and ankle effectively.  (*Id.*)  Plaintiff received Ibuprofen and ice to apply to the area.  (*Id.*)  He also received a lay-in to be seen by medical staff the following day, and a health slip/pass for a crutch until he was seen.  (*Id.*)

ARNP Streetman examined Plaintiff on April 15, 2013.  (*Id.* ¶ 8).  ARNP Streetman submitted a radiology request for an X-ray of Plaintiff's ankle in order to rule out a spontaneous fracture or soft-tissue injury.  (*Id.*)  For injuries such as Plaintiff's, ARNP Streetman regularly ordered X-rays in order to determine whether any soft-tissue injury was present.  (*Id.*)

As ARNP Streetman requested, an X-ray of Plaintiff's ankle was performed on April 15, 2013.  (*Id.* ¶ 9).  The radiology report noted the views of Plaintiff's ankle demonstrated no fracture, dislocation or subluxation.  (*Id.*)  No joint effusion or plantar spur was observed.  (*Id.*)  Plaintiff's bone density was normal and uniform, and his ankle mortise was

intact.  (*Id.*)  Minimal degenerative changes and some soft-tissue swelling were observed.  (*Id.*)

ARNP Streetman saw Plaintiff again on April 22, 2013.  (*Id.* ¶ 10). Plaintiff reported his ankle was doing much better and had much less swelling.  (*Id.*)  He did admit his ankle still felt tight, and he was not yet able to take a full step without limping.  (*Id.*)  ARNP Streetman observed no swelling or bruising of Plaintiff's ankle, and he was able to wiggle his toes, bear weight on his ankle, and move his ankle in all directions.  (*Id.*)  ARNP Streetman reviewed Plaintiff's X-ray results, which showed no fracture, dislocation, subluxation, deformity or soft-tissue injury.  (*Id.*)  Based on the X-ray results, Plaintiff's statements, and ARNP Streetman's observations, she assessed Plaintiff with an improving right ankle sprain.  (*Id.*)  At this time, Plaintiff displayed no signs or symptoms consistent with a torn Achilles tendon.  (*Id.*)  Specifically, his ankle was not tender, did not display decreased range of motion, and he was not unable to bear weight.  (*Id.*) ARNP Streetman provided Plaintiff a brace to support his ankle as it healed and instructed him to follow up as needed.  (*Id.*)  Based on Plaintiff's comments and his objective presentation, crutches, a wheelchair, and a cast were not medically indicated at this time.  (*Id.*)

On May 14, 2013, Plaintiff saw Nurse Porter for complaints of pain and swelling in his ankle.  (*Id.* ¶ 11).  Nurse Porter noted Plaintiff had numbness and mild swelling in the back of his calf.  (*Id.*)  As Plaintiff was continuing to have pain, ARNP Streetman submitted another radiology request for an X-ray of his right tibia and fibula.  (*Id.*)

On May 16, 2013, Nurse Epps saw Plaintiff in response to a sick-call request.  (Epps Decl. ¶ 8).  Plaintiff complained of ankle pain, which he rated 7/10.  (*Id.*)  Nurse Epps observed numbness and moderate swelling in Plaintiff's ankle, and he experienced pain when pushing his ankle forward.  (*Id.*)  Nurse Epps also observed, however, no tingling present in Plaintiff's right ankle, and he was able to move his ankle and foot.  (*Id.*)  Noting Plaintiff was scheduled for an X-ray later that day, Nurse Epps encouraged him to report back later for his X-ray.  (*Id.*)  Nurse Epps also provided Plaintiff ten packets of Ibuprofen to take as needed for pain.  (*Id.*)  Additionally, Nurse Epps instructed Plaintiff to elevate his ankle for two to three days, and to report any skin discoloration.  (*Id.*)

The X-ray of Plaintiff's tibia and fibula was performed on May 16, 2013.  (Streetman Decl. ¶ 13).  The radiology report noted the X-ray demonstrated no fracture, dislocation or subluxation.  (*Id.*)  No joint effusion or plantar spur was observed.  (*Id.*)  Plaintiff's bone density was normal

and uniform, his joints articulated normally, all cortical margins were intact, and the soft-tissue planes were normal without any radiopaque foreign bodies.  (*Id.*)

On May 24, 2013, Plaintiff was seen by Nurse Woulard in response to a sick-call request.  (*Id.* ¶ 14).  Plaintiff complained of pain and swelling and requested an MRI.  (*Id.*)  Plaintiff received Ibuprofen and was instructed to apply an ACE wrap to his ankle, elevate it for two to three days, to report any skin discoloration.  (*Id.*)  Nurse Woulard noted Plaintiff would be referred to a clinician.  (*Id.*)

On June 10, 2013, Plaintiff was examined and evaluated by Dr. Almeyda-Gomez.  (*Id.* ¶ 16).  Dr. Almeyda-Gomez assessed Plaintiff with a strain/sprain of his Achilles tendon.  (*Id.*)  Dr. Almeyda-Gomez submitted orders for Plaintiff to receive Ibuprofen for 30 days, and an ankle brace to wear for ambulation.  (*Id.*)  He also signed a health slip/pass restricting Plaintiff from physical activity, running or jumping for 30 days, and ordered Plaintiff be seen for a 30-day follow-up.  (*Id.*)

On June 25, 2013, Plaintiff was seen by Dr. Almeyda-Gomez for a callout.  (*Id.* ¶ 17).  Per Dr. Almeyda-Gomez's orders, Plaintiff received a new ankle brace.  (*Id.*)  Dr. Almeyda-Gomez noted Plaintiff's Achilles tendon was not responding to current treatment, and ordered an MRI of his

ankle and Achilles tendon.  (*Id.*)  Plaintiff's MRI was initially scheduled for July 9, 2013.  (*Id.*)  However, Plaintiff failed to attend his scheduled MRI appointment.  (*Id.* ¶ 18).  A new MRI was scheduled for July 15, 2013.  (*Id.*)

The MRI of Plaintiff's ankle was performed on July 15, 2013.  (*Id.* ¶ 19).  The MRI report showed Plaintiff had a high-grade, full-thickness tear of his Achilles tendon, with approximately five centimeters of diastasis between the proximal and distal ends.  (*Id.*)  The report noted there was probable hemorrhage and edema within the tract, and the Achilles tendon was markedly abnormal.  (*Id.*)  Otherwise, the results were unremarkable. (*Id.*)

On July 23, 2013, Dr. Almeyda-Gomez reviewed Plaintiff's MRI results.  (*Id.* ¶ 20).  On August 6, 2013, Dr. Almeyda-Gomez examined Plaintiff and issued him a health slip/pass, restricting him from any prolonged standing for more than 30 minutes, for one year.  (*Id.*)  Dr. Almeyda-Gomez also ordered Plaintiff be seen for an orthopedic evaluation and treatment recommendation.  (*Id.*)

Plaintiff was scheduled for a consult with orthopedic surgeon Dr. Maxwell Steel on August 12, 2013.  (*Id.* ¶ 21).  He was transferred to the Reception and Medical Center ("RMC") Main Unit on August 6, 2013.  (*Id.*) He was seen by Dr. Steel for an orthopedic consult on August 12, 2013.

(*Id.* ¶ 22).  Dr. Steel reviewed Plaintiff's X-ray and MRI results, and his noted findings included calf atrophy with palpable defect.  (*Id.*)  Dr. Steel recommended a repair/reconstruction of Plaintiff's Achilles tendon.  (*Id.*)

On August 14, 2013, Plaintiff was seen by Nurse D.N. Wainwright and Dr. Juan De Los Santos for complaints of right ankle pain after falling in the recreation yard.  (*Id.* ¶ 23).  Dr. De Los Santos noted Plaintiff reported he had twisted his right ankle and felt a pop, and that he was awaiting surgery for his ruptured Achilles tendon.  (*Id.*)  Dr. De Los Santos further noted Plaintiff's Achilles area was painful on movement, but no edema or cyanosis was observed, and his ankle demonstrated full range of motion.  (*Id.*)  Plaintiff received a right leg short posterior cast to wear until his surgery.  (*Id.*)  Plaintiff also received health slips/passes for: a bed rest lay-in until August 17, 2013; and a low/bottom bunk lay-in, a restricted activity lay-in prohibiting work, sports, lifting, pushing, and pulling, and a lay-in for crutches until September 14, 2013.  (*Id.*)

On September 9, 2013, Plaintiff was admitted to the RMC Main Unit for a right Achilles tendon repair with reconstruction using plantaris tendon. (*Id.* ¶ 24).  Dr. Steel performed the surgery, and Plaintiff tolerated the procedure well.  (*Id.*)

On September 17, 2013, Plaintiff was discharged from the RMC Main Unit following his right Achilles tendon repair and reconstruction.  (*Id.* ¶ 25). Plaintiff's discharge condition was stable.  (*Id.*)  His discharge medications included Tramadol (a narcotic-like pain reliever) and Motrin (an anti-inflammatory).  (*Id.*)  Plaintiff was also discharged with crutches.  (*Id.*)  His discharge instructions included daily wound care and no weight bearing, and he was instructed to perform self-stretching exercises and to keep his right foot elevated.  (*Id.*)  Upon discharge, he received lay-ins for: bed rest until September 18, 2013; restricted activity and crutches until October 16, 2013; daily dressing changes until October 17, 2013; and a low bottom bunk until December 17, 2013.   (*Id.*)  Plaintiff was also scheduled to see Dr. Steel for a follow-up.  (*Id.*)

As ordered, Plaintiff saw Dr. Steel for a follow-up on September 23, 2013.  (*Id.* ¶ 26).  Dr. Steel noted Plaintiff's surgical wound was healing well, and recommended he continue avoiding bearing weight on his ankle, and continue using his ankle splint and crutches.  (*Id.*)  Consistent with Dr. Steel's recommendation, on September 26, 2013 Plaintiff received a health slip/pass for an ankle splint and crutches for 30 days.  (*Id.*)  Plaintiff was also scheduled for another follow-up in two weeks.  (*Id.*)

On September 30, 2013, Plaintiff saw Dr. Luis Quinones at the RMC Main Unit in response to a sick-call request.  (*Id.* ¶ 27).  Plaintiff complained he had fallen in the shower and requested a wheelchair.  (*Id.*) Dr. Quinones noted Plaintiff was currently on crutches and was healing well.  (*Id.*)  Plaintiff received a health slip/pass for a wheelchair for one week.  (*Id.*)

On October 7, 2013, Plaintiff saw Dr. Steel for another follow-up.  (Id. ¶ 28).  Dr. Steel noted swelling in Plaintiff's ankle, and he needed physical therapy, an ankle brace, and a walking boot.  (*Id.*)  Dr. Steel requested Plaintiff be fitted for a walking boot, a referral to the brace shop, and physical therapy.  (*Id.*)  Plaintiff was scheduled for a physical therapy evaluation on October 16, 2013. (*Id.*).

On October 16, 2013, Plaintiff was evaluated for a walking boot by Dr. Almeyda-Gomez.  (*Id.* ¶ 29).  Dr. Almeyda-Gomez noted Plaintiff presented with crutches and partially bearing weight on his ankle.  (*Id.*)  Dr. Almeyda-Gomez observed increased pain with prolonged standing, and mild edema of the right foot.  (*Id.*)  Dr. Almeyda-Gomez recommended Plaintiff be given an ankle brace to wear as needed for pain, and that he undergo physical therapy three times a week for six weeks.  (*Id.*)  Plaintiff also received a health slip/pass for walking boots for one year.  (*Id.*)

On October 24, 2013, Plaintiff was seen for physical therapy at the RMC Main Unit.  (*Id.* ¶ 30).  Plaintiff reported his surgical wound had opened up, and he had to have his dressing changed daily.  (*Id.*)  It was noted Plaintiff had not met any goals set by primary physical therapy, and he would benefit from continued physical therapy to increase his strength, range of motion, and gait following surgery.  (*Id.*)  Plaintiff received a health slip/pass for daily wound care for one week.  (*Id.*)

On November 5, 2013, Plaintiff was seen at the RMC.  (*Id.* ¶ 31).  A small amount of drainage was noted from his surgical incision.  (*Id.*)  Plaintiff received another health slip/pass for daily dressing changes for one month.  (*Id.*)  On November 8, 2013, Plaintiff received an order for Levaquin, an antibiotic, for an infection in his wound site.  (*Id.* ¶ 32).

On November 11, 2013, Plaintiff was transferred from the RMC back to JCI.  (*Id.* ¶ 33).  At this time, Plaintiff required passes for a low bunk and a walking boot.  (*Id.*)  On November 12, 2013, he received a health/slip pass to see a medical provider daily until he was healed.  (*Id.* ¶ 34).

Plaintiff was seen by Dr. Almeyda-Gomez on November 18, 2013.  (*Id.* ¶ 35).  Plaintiff presented with a walking boot.  (*Id.*)  Dr. Almeyda-Gomez submitted a consult request for Plaintiff to receive follow-up physical therapy, three times a week for six weeks.  (*Id.*)

On November 21, 2013, Plaintiff was issued a health slip/pass for a low bunk until December 31, 2013.  (*Id.* ¶ 36).  He also saw Nurse Epps for a dressing change.  (Epps Decl. ¶ 20).  Nurse Epps noted his surgical site was without any erythema or odor, with mild edema.  (*Id.*)  Nurse Epps removed Plaintiff's bandage and observed no drainage, and cleaned the surgical site and changed his dressing.  (*Id.*)  Nurse Epps referred Plaintiff for an evaluation of the need to continue his dressing changes.  (*Id.*)

ARNP Streetman saw Plaintiff on November 25, 2013 for a surgical follow-up.  (Streetman Decl. ¶ 38).  Plaintiff presented in a walking boot and reported he needed more physical therapy.  (*Id.*)  ARNP Streetman observed Plaintiff's surgical incision was closed, without any drainage or odor.  (*Id.*)  As such, ARNP Streetman determined Plaintiff could discontinue daily dressing changes.  (*Id.*)  ARNP Streetman observed some swelling remained on both sides of Plaintiff's ankle, and he was able to flex his ankle up-and-down and side-to-side.  (*Id.*)  The condition of Plaintiff's ankle at this time was consistent with a recovery following an Achilles tendon repair.  (*Id.*)  ARNP Streetman instructed Plaintiff to follow up if he noticed any increased redness, swelling or drainage.  (*Id.*)  She also instructed him to continue his exercises and scheduled a follow-up in two weeks.  (*Id.*)

On November 30, 2013, Plaintiff saw Nurse Epps for another dressing change and wound cleaning.  (Epps Decl. ¶ 21).  Nurse Epps observed mild edema of Plaintiff's right ankle, but noted no signs or symptoms of infection were present.  (*Id.*)

On December 9, 2013, Plaintiff saw Dr. Almeyda-Gomez for a follow-up.  (Streetman Decl. ¶ 40).  Plaintiff presented wearing a boot on his right foot and reported he was having pain at the top of his surgical area.  (*Id.*)  Dr. Almeyda-Gomez noted Plaintiff's surgical scar had healed, and his ankle showed good range of motion.  (*Id.*)  Dr. Almeyda-Gomez advised Plaintiff to perform ankle exercises when he was not wearing his boot in order to improve his range of motion.  (*Id.*)  Dr. Almeyda-Gomez also ordered Plaintiff Ibuprofen.  (*Id.*)

On December 13, 2013, Plaintiff was transferred to the RMC Main Unit for physical therapy.  (*Id.* ¶ 41).  Plaintiff attended his first physical therapy session on December 23, 2013, and his last session on January 16, 2014.  (*Id.*)  He attended a total of 12 sessions.  (*Id.*)  On the day of his last session, Plaintiff stated he was not doing physical therapy, and refused to sign the refusal form.  (*Id.*)

On May 2, 2014, Plaintiff was transferred to the Wakulla Correctional Institution Annex.  (*Id.* ¶ 42).

In support of his summary judgment motion, Dr. Almeyda-Gomez submits the affidavit of Dr. Michael X. Rohan, M.D.  (ECF No. 81)  Dr. Rohan is an orthopedic surgeon licensed to practice medicine in the State of Florida.  Dr. Rohan reviewed Plaintiff's First Amended Complaint and Plaintiff's medical records pertaining to his claims in this case.  Based upon his review, Dr. Rohan opines that Dr. Almeyda-Gomez met or exceeded the applicable professional standard of care for medical professionals in providing treatment and care to Plaintiff and showed no deliberate indifference to Plaintiff's medical needs.  *Id.*

Defendants argue that to the extent that Plaintiff is seeking to assert a medical malpractice claim under Florida law, he has failed to comply with Florida's mandatory prerequisites for such actions.  *See* Fla. Stat. §§ 766.106, 766.203.  Plaintiff does not dispute that he has failed to satisfy the prerequisites.  *See* ECF Nos. 69, 85.

With respect to Plaintiff's deliberate-indifference claims, the parties do not dispute whether Plaintiff's ankle injury was an objectively serious medical need.  The issue, then, is whether the Defendants were deliberately indifferent to that need.  The record of Plaintiff's medical care and treatment supports a conclusion that they were not.  As summarized above, Defendants have presented competent summary judgment

evidence that Plaintiff received timely and continuous care following his injury, and that Plaintiff's care initially was conservative because the providers determined, based upon their examination, his clinical presentation, and objective assessments, that conservative care was sufficient.  As summarized above, from the time of the injury on April 11, 2013, through the end of June, 2013, several nurses and a physician assessed Plaintiff with a strain/sprain of his Achilles tendon and treated the injury accordingly.  On June 25, 2013, Dr. Almeyda-Gomez determined that Plaintiff's tendon injury was not responding to current treatment and escalated the diagnostics and treatment to include an MRI and then surgical repair of the tendon.

In opposition to summary judgment, Plaintiff points to medical records that he asserts made the Defendants aware that his injury was more severe than eventually confirmed by the MRI.  Plaintiff argues that the radiology report of April 22, 2013, which noted "soft tissue swelling," proves that the medical staff knew of "soft tissue damage . . . yet they refused to be proactive and schedule an MRI."  ECF No. 69 at 2.  But evidence of "soft tissue swelling" is also consistent with Defendants' evidence that Plaintiff's injury was initially diagnosed as a sprain/strain.

Plaintiff argues that the MRI report confirming the tendon tear shows that the medical staff "took far too long to conduct (schedule) an MRI)". *Id*. at 4.  As noted above, several nurses and a physician diagnosed Plaintiff with a tendon sprain/strain, but upon determining that the injury was not responding to treatment Dr. Almeyda-Gomez *did* schedule an MRI. Plaintiff's conclusional allegation, based on his subjective belief that he should have received an MRI sooner, is insufficient to create a genuine issue of material fact.  *See, Waddell*, 276 F.3d at 1279.

Plaintiff contends that deliberate indifference is established because no walking assistance or cast was provided until he reinjured the tendon while he was awaiting surgery.   ECF No. 69 at 6.  But Defendants' summary judgment evidence shows that Plaintiff was provided with an ankle brace, walking boot, crutches, and a wheelchair at such times as the devices were medically indicated.  *See* ECF No. 59, Exhibit A, Declaration of Sandra Streetman, A.R.N.P.  ¶ 7, 16-17, 23, 25, 26-29, 33, 38, 40, 42.

Plaintiff conclusionally alleges that ARNP Streetman "gave an intentionally false prognosis that the patient's ankle was healing (a medical miracle without reconstructive surgery)."  ECF No. 69 at 12.  This claim is based on Streetman's clinic notes of April 22, 2013, in which she described Plaintiff's right ankle sprain as "improving" based on her note that Plaintiff

stated he was doing "much better".  ECF No. 69 at 12-13.  Plaintiff asserts that he submitted inmate sick-call requests that were "destroyed" that described the severity of his injury as a "ripped" Achilles tendon and the extent of his pain and complete inability to walk.  ECF No. 69 at 14-18. Plaintiff concedes that these requests are not part of his medical record. And notably, Plaintiff has not come forward with any evidence that these forms and the information contained on them were seen by his medical providers.  *See id*.

Defendants contend that it does not appear that these forms were submitted to the nursing supervisor for triage because Plaintiff has included in his original filing both the original form and the second page copy; the original is usually provided to the nursing supervisor while the copy is provided to the inmate.  ECF No. 70 at 5-6.   Neither Plaintiff's summary judgment response nor the statements contained in the exhibits are sworn, and therefore there is no basis for the Court to accept Plaintiff's assertions in this regard as true.  *See* ECF No. 69.

Further, as Defendants contend, Plaintiff's claims fly in the face of the record, in which no provider noted that Plaintiff was unable to walk or that Plaintiff had reported to them that his Achilles tendon was torn.  *See* ECF No. 70 at 6.

At its essence, this case is one in which Plaintiff wanted a different, less conservative, treatment than that which the medical staff provided. These are plainly matters of medical judgment that are not an appropriate basis for liability under the Eighth Amendment.   *See Adams*, 61 F.3d at 1545; *Waldrop,* 871 F.2d at 1033.  Furthermore, Plaintiff has also failed to prove that the alleged delay in seeing a specialist worsened his condition. *See Goebert*, 510 F.3d at 1329 (where a plaintiff alleges that his treatment was delayed, the question is whether the delay worsened the inmate's condition).  And lastly, Plaintiff's claims that Defendants were deliberately indifferent regarding his post-surgical care are wholly conclusional and unsupported by any evidence in the record.

Where, as here, the medical records demonstrate that the inmate received adequate treatment, an inmate's desires and subjective beliefs are insufficient to demonstrate a genuine issue of material fact. *See Waddell*, 276 F.3d at 1279; *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that []he did not feel []he received adequate treatment.").  Even viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue of

material fact regarding whether Defendants were deliberately indifferent to Plaintiff's serious medical needs.

## IV.  RECOMMENDATION

For the foregoing reasons, it is respectfully **RECOMMENDED**:

> 1.  Defendants Corizon, LLC, Linda Cain, Guilda Epps and Sandra Streetman's  Motion for Summary Judgment, ECF No. 58, should be **GRANTED.**
>
> 2.  Defendant, Dr. Juan Almeyda-Gomez's Motion for Final Summary Judgment, ECF No. 80, should be **GRANTED**, and Defendant, Juan Almeyda-Gomez's Motion to Dismiss Amended Complaint, ECF No. 63, should be **DENIED** as **MOOT.**
>
> **IN CHAMBERS** this 18th day of August, 2016.

*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the Court's internal use only, and does not control. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**